ESTATE PROPERTY CORPORATION, Plaintiff, v. HUDSON COAL COMPANY, Defendant.

Supreme Court, New York County, July 30, 1928.

Mines and mining — lease — lease of coal mine stipulated for minimum royalties and that lessee would proceed in proper workmanlike manner — for four years lessee failed to mine — plaintiff not entitled to royalties on coal that might have been mined during that time — lessee liable for fixtures removed prior to expiration of lease — lessee not liable in conversion for using coal in culm bank — lessee liable for royalties as to coal that was rendered unminable because of its negligence — said cause of action was added by amendment after enactment of Arbitration Law of Pennsylvania — Arbitration Law applicable to said cause of action.

Plaintiff's assignor leased a coal mine to defendant's assignor.   The lease stipulated for minimum royalties and also provided that the lessee would proceed with and carry on the mining of the coal in a skillful and workmanlike manner, and at the end of the term would surrender the property in good order with all buildings, equipment and improvements erected thereon by the lessee.   The defendant, who acquired the lease by assignment, failed for four years to work the mine.   At about the time it procured the lease by assignment, the lease was modified by inserting a provision that if in the opinion of the engineers of the lessee all of the coal remaining on the premises capable of being mined under the terms of the agreement had been paid for in advance, no further minimum payments should be made until the quantity of coal so paid for in advance had been mined, and that the opinion of the engineers might be subject to re-examination by arbitrators.

The first cause of action to recover royalties that might have been received if the mine had been operated during the four years in question, does not state a cause of action because to allow the plaintiff to recover royalties on unmined coal would be to grant it double payment.

The best that can be said for the plaintiff is that it may be entitled to interest on royalties that were not paid because of the failure to mine.   But this relief must be denied since the plaintiff acquiesced in the conduct of the defendant in failing to operate the mine, and it cannot be heard to enter a protest six years after the alleged breach of the agreement.

That part of the first cause of action which is based upon the act of the defendant in removing fixtures, equipment and improvements from the mine prior to the expiration of the lease is sufficiently pleaded.   The defendant is liable under that cause of action, especially in view of the fact that its notice that it could no longer profitably mine the coal amounted to an abandonment of the mine and lease, and having at least theoretically surrendered the property it did not have the right under the lease to remove the fixtures which required the lessee to leave all fixtures on the property at the termination of the lease.

The cause of action based on an alleged conversion of 100,000 tons of coal deposited in a culm bank, does not show any liability on the part of the defendant in conversion, for, under the lease, it was presumptively entitled to the coal subject to the payment of royalties.

If, as alleged by the plaintiff, the defendant, through its failure to operate the mine and properly care for it, caused certain portions of the coal to become

unminable, then the defendant is liable for royalties on so much of the coal as through its negligence was rendered unminable.

The defendant is entitled to have that claim determined by arbitration. It appears that the complaint was amended in 1928 to add that cause of action, and that prior thereto the Arbitration Law of Pennsylvania was enacted which provides for compulsory arbitration where a written contract stipulates that the parties will arbitrate. While the arbitration statute cannot operate retroactively as to a cause of action already commenced, nevertheless the cause of action under discussion was not stated until after the act became effective, and, therefore, it may be treated as a new action so as to give the defendant the right to demand arbitration. If the defendant, which in its answer set forth a demand for arbitration, will proceed with reasonable dispatch no doubt the court will compel arbitration as to that cause of action.

MOTION for judgment on pleadings in action on lease.

*Platt, Field & Taylor* [*George W. Field* of counsel], for the plaintiff.

*H. T. Newcomb* [*Samuel Seabury, H. T. Newcomb* and *Thomas L. Ennis* of counsel], for the defendant.

LEVY, J.   Defendant moves for judgment on the pleadings. In the amended complaint three causes of action are alleged, although the first may be deemed to state two separate causes — one for loss of royalties by reason of defendant's failure to operate a tract of coal land leased from plaintiff; the other for improper removal from the land of buildings and equipment. The second cause of action is for the conversion of coal in a certain culm bank. The third cause is for negligence due to the defendant's mismanagement of mining operations, by which plaintiff suffered irretrievable injury in the loss of 100,000 tons of coal, and other damage. The action arises out of an alleged breach of a written contract dated November 17, 1898, whereby one Frances A. Hackley leased to the Dolph Coal Company for a period of twenty years the right to mine and carry away coal from a 150-acre tract of land belonging to her, situated in Lackawanna county, Penn. The lessee had "the privilege of mining and removing from the said lands, and shall pay for the same, whether mined or not," certain graduated quantities of coal, which, beginning with the year 1903, were to be increased to 40,000 tons per annum, until the expiration of the term, or until the coal supply became so far exhausted that so large a quantity could not be produced. Royalties were to be paid, varying in amount with the size of the coal. Payments were to be made for clean merchantable coal, except that no such qualification attached to the small size known as "Number One Buckwheat," and sizes smaller. The lessee covenanted to "proceed with and carry on the mining of coal from said land, and in a skillful and workmanlike manner, conduct such mining * * * as may be necessary for the proper working of said mines; and conduct the

colliery business so as to produce the yearly minimums specified herein. And it shall work said mines and dig said coal in such manner, that at the expiration of this lease, all of the unmined coal in said lands may be worked and mined with safety and without unnecessary expense." At the end of the term the lessee was to surrender in good order the property with all buildings, equipment and improvements erected by it, without compensation by the lessor, but with the privilege to remove all engines, unless the lessor paid for them at a valuation to be agreed. All disputes or differences under the contract were to be arbitrated in the usual manner.

The lessor in 1903 conveyed the tract and her interest in the lease to Minot J. Savage; and on April 17, 1916, the latter entered into an agreement with the Dolph Coal Company modifying the original contract in the following particulars, among others: The original letting was made (a) " demising leasing and mine letting * * * of all the merchantable and mineable coal in, under and upon the tract of land * * * with the right to mine and remove the same until the same shall be exhausted, * * *." The minimum annual royalty was fixed at $5,000, and this provision added, which has led to considerable controversy: " It is further agreed that whenever in the opinion of the engineers of the party of the second part, its successors or assigns, all of the coal remaining in the premises capable of being mined under the terms of this agreement has been paid for in advance, no further minimum payments shall be required until the quantity of coal so paid for in advance has been mined and thereafter royalty shall be paid only upon such coal as shall actually be mined when mined. The said opinion of the engineers shall be subject to re-examination by arbitrators as in said lease provided." On July 3, 1916, the Dolph Coal Company assigned its lease to defendant. The latter held the property for four years, and during that time failed to carry on any constructive operations whatsoever. On July 8, 1920, it assigned its interest to the Humbert Coal Company, which seems to have carried on active operations since. Three months prior to such assignment defendant in writing notified plaintiff's assignor that its engineers were of the opinion that all of the coal capable of being mined under the terms of the lease had been paid for in advance, and no further royalty payments would be made after May 1, 1920, until the quantity of coal already paid for had been mined.

The complaint in the first cause of action, brought nearly six years after cessation of activities, is based principally upon the claim that the lease obligated defendant to conduct active mining

·operations; that it did not discharge this obligation by merely paying the minimum royalty in the form of " dead or sleeping rent " (*Rex* v. *Bedworth,* 8 East, 387); and that its failure to conduct active operations deprived plaintiff of royalties equal to the difference between what it would have obtained by such activities and the minimum actually paid. It relies chiefly upon *Genet* v. *Delaware & Hudson Canal Company* (136 N. Y. 593). In that case, however, defendant by the negligent conduct of operations caused a " squeeze " or collapse, which rendered further mining useless and vain. The Court of Appeals there held that the lessee's obligation was not discharged by merely continuing payment of the minimum royalty, but that it was required to pay royalties on the amount which would have been earned by proper operations. True, here there was a covenant to conduct active operations — a provision only implied in the Genet lease. But the failure to mine did not cause damage of the nature claimed by plaintiff. The most the latter could be said to have suffered would be the loss of interest on the deficiency in royalties. If it were allowed the principal as well, it would be in the position of receiving double payment for the same coal, because the mineral would still be in the ground, available in subsequent operations.

But even that measure of relief in connection with this grievance must be withheld. For four years plaintiff's assignor acquiesced in defendant's failure to conduct any mining, being apparently content with the minimum royalties. When the engineers rendered the opinion under the contract that further royalties would be withheld, plaintiff made only feeble protest, if it can be called such, and this, four months later, with no attempt to invoke the arbitration clauses. It is true that plaintiff now claims that the opinion was fraudulent, but the allegations in that direction are rather weak. At most they indicate a mistaken view by the engineers, based upon insufficient data. On the whole, plaintiff should not be heard at this time, after having failed to speak when timely and frequent opportunity offered itself.

As to the second grievance contained in the first cause of action, this rests upon an entirely different foundation. Defendant, between April and June, 1920, stripped the tract of fixtures, equipment and improvements of the value of $141,100. Under the terms of the contract these were to remain on the land at the termination of the lease. Defendant argues that the equipment removed belonged to it until the actual expiration of the lease, and as the term of demise had not yet expired, it could not be called to account. It attempts to draw a distinction between acts of waste for which

the landlord may hold the tenant liable after the expiration of the term, and waste in the nature of the breach of a covenant for which an action may be brought during the term.   The distinction is not sound.   In *Agate* v. *Lowenbein* (57 N. Y. 604) the court said (at p. 614): " It is, in general, no justification for an act of waste that a party will, at some future time, put the premises in the same condition as they were when the lease was made.   The question is, whether the tenant, at the time the wrongful act was done, caused an injury which then affected the plaintiff as to his reversion. How can it be known, as matter of law, that a tenant will retrace his steps and repair an injury which he has deliberately caused? The landlord has a right to a continuance of the state of things as they existed when the injury was done."

Defendant questions the applicability of that rule, because there the action was brought after the termination of the lease.   But as Judge McADAM well said in *Cahn* v. *Hewsey* (8 Misc. 384, 386): " The inquiry is, whether there is damage done which injures the reversion.   This injury may be immediate, though the enjoyment of the reversion is postponed.   *Agate* v. *Lowenbein,* 57 N. Y. 614." Moreover, the engineers' opinion upon which defendant so strongly relies to sustain its position that it was not bound to pay further royalty because coal could not be profitably mined any longer, is a virtual abandonment of the mine.   Obviously, the course of subsequent events proves they were mistaken.   But there is no more interesting application of the homely adage that what is sauce for the goose is sauce for the gander.   Having, at least theoretically, yielded up the property as no longer profitable defendant proceeded to strip it of its equipment.   This it could not do, as the fixtures in that circumstance under the very contract had become a part of the reversion.

The second cause of action is for the conversion of 100,000 tons of coal deposited in the culm bank.   Plaintiff may have a just grievance but certainly not in conversion.   Under the modified contract defendant became the owner of all minable coal, subject of course to the payment of royalties.   It could not, there-fore, be charged with converting what is seemingly its own property. *Genet* v. *Delaware & Hudson Canal Co.* (163 N. Y. 173) may furnish a basis for a royalty claim by plaintiff in this connection, but in any event does not sustain its right to bring an action in conversion.

The third cause of action, which is set up for the first time in the amended complaint, involves a claim of damages arising from defendant's failure to keep the fixtures and equipment in good order between 1916 and 1920, and allowing the workings to fall and

cave so that it became impossible to conduct mining operations in the tract, without extensive preparation involving long delays. By reason of this fact 100,000 tons of coal became inaccessible and impossible to mine, with a permanent loss in royalties of $100,000. And when defendant's assignee obtained possession and mining was resumed, it required considerable preparation and delay to restore the mines in proper condition. During the interval plaintiff lost the royalties which otherwise it might have obtained to the extent of $11,892. To this cause the defense interposed alleges that on March 15, 1928, plaintiff served notice that it would amend the complaint so as to incorporate this cause of action; that on March 28, 1928, defendant served a notice demanding arbitration pursuant to the terms of the agreement, but plaintiff refused or neglected to proceed, although defendant has been and still is willing to arbitrate. The amended complaint incorporating this new cause of action is verified April 27, 1928. Does the complaint in this respect state a good cause of action? If it does, should not its disposition, nevertheless, be governed by the agreement to arbitrate? It undoubtedly spells out a good plea for the loss of royalties on coal made permanently unavailable. As to the loss of royalties due to the delay of defendant's assignee in resuming normal operations occasioned by defendant's neglect, it must be said that such loss is not permanent. The Humbert Coal Company presumably is still mining coal, and if, as already pointed out, plaintiff were permitted to collect royalties for deficiency in quantity from defendant, it might be the recipient of payment over again by collecting revenue for the identical coal from the present operator. To be sure it has suffered a loss, if it can prove its assertions, but that loss can be no greater than the mere interest on royalties which should have been paid, and which would probably be determined by the present worth of such interest measured by the life of the lease.

But should the court entertain jurisdiction in view of the arbitration clause contained in the agreement? The solution of this, in the light of the subject-matter and the contemplation of the parties, must be governed by the laws of Pennsylvania. The original action was commenced about March 6, 1926. The Arbitration Law of Pennsylvania (P. L. 381, No. 248) was not enacted until April 25, 1927. Section 1 of that statute is substantially identical with section 2 of the New York Arbitration Law. It decrees that " A provision in any written contract, * * * to settle by arbitration a controversy thereafter arising out of such contract, or out of the refusal to perform the whole or any part thereof, or an agreement in writing between two or more persons

to submit to arbitration any controversy existing between them at the time of the agreement to submit, shall be valid, irrevocable, and enforcible * * *." It may be assumed that in view of the identity of the provisions of the Pennsylvania statute with that of New York, the construction given by the courts here to our statute passed seven years earlier, may very likely be adopted by the tribunals in the sister State. In *Matter of Berkovitz* v. *Arbib & Houlberg* (230 N. Y. 261) it was held by our Court of Appeals that the Arbitration Law will be applied to contracts made prior to its enactment — where such contracts contain a proper arbitration clause. But if an action is already pending at the time of the passage of the law, its proceedings will not be stayed. As Judge Cardozo said (at pp. 272, 273): " The plaintiff then elected to disregard the arbitration clause, and seek a remedy in the courts. The defendant did, it is true, demand the benefit of the clause, but at the date of the joinder of issue the defense was insufficient in law. To hold that the Arbitration Law of 1920 applies in such conditions is to nullify a cause of action by relation, and by relation again to establish a defense. Years of costly litigation will thus be rendered futile. Nothing in the language of the statute gives support to the belief that consequences so harsh and drastic were intended by the Legislature. ' If any suit or proceeding *be* brought,' its progress shall be stayed (Arbitration Law, section 5). Full effect is given to this provision when it is limited to suits or proceedings brought thereafter. We are not to presume a willingness that rights already accrued through actions lawfully initiated are to be divested or impaired * * *. In such circumstances, it is impossible to apply the statute to the stages of the litigation that remain without applying it at the same time, at least in some degree, and with some extent of prejudice, to those that have gone by."

It becomes apparent that the existence of a pending litigation at the time the Arbitration Law took effect renders it impossible to enforce specific performance of a contract to arbitrate. But here, while the main litigation was pending at the time, it must be evident that the third cause of action was not initiated until after the passage of the Pennsylvania act. For all purposes it may thus be considered a new action in respect to the third cause, and the arbitration clause may, therefore, be specifically invoked as to it. How has defendant availed itself of the remedy? By merely answering on the merits it might have been deemed to waive arbitration. (*Matter of Zimmerman* v. *Cohen*, 236 N. Y. 15.) But in addition it has set forth its demand for arbitration and a willingness to submit. In *Nagy* v. *Arcas Brass & Iron Co.* (242 N. Y. 97, 98) the effect of such an answer was thus aptly

stated: "While the agreement to arbitrate is not itself properly pleaded either as a defense or a counterclaim, when pleaded it is no less an assertion that the defendant does not intend to abandon his rights, and so rebuts any inference that would otherwise be drawn from the mere service of the answer. (*Matter of Hosiery Manufacturers Corp.* v. *Goldston*, 238 N. Y. 22.) But the Arbitration Law contemplates prompt action and too long a delay in seeking appropriate relief may be easily construed as an indication that this claim is waived."

If defendant should with reasonable dispatch move for a stay of this action pending a proper application to enforce arbitration, the motion would most likely be granted.

The motion for judgment on the pleadings, therefore, will be granted to the extent of dismissing the first and second causes of action, with leave to plaintiff to plead over as to the second cause, and as to the first cause only in so far as the removal of the equipment is concerned.